## VERIFICATION AFFIDAVIT IN SUPPORT OF FORFEITURE COMPLAINT

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief:

### INTRODUCTION

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI).  I have been a Special Agent for approximately 19 years.  I am currently assigned to the White Collar Squad of the Fort Worth Resident Agency.  My duties on the White Collar Squad include conducting investigations into alleged financial crimes often involving violations of the laws of the United States, collecting evidence in cases in which the United States is or may be a party-in-interest, and performing other duties imposed by law.  I have personally participated in this investigation and am thoroughly familiar with the information contained in this affidavit.

2.      The information contained in this affidavit is the result of my own investigation, information provided to me by other investigators and law enforcement officers, and stipulated facts admitted by Alexis Norman in connection with her plea of guilty to Count One of a two-count indictment charging her with health care fraud in violation of 18 U.S.C. § 1347.  When I recite information from others, I have gained that information either by talking directly to such investigators and law enforcement officers or reviewing written reports of their investigation, or both.  This affidavit accurately

**Verification Affidavit – Page 1**



summarizes Norman's admissions and the evidence I discovered during my investigation; it does not, however, contain every detail known to me about the investigation.

## PROPERTY FOR FORFEITURE

3.      This affidavit is made to support the complaint for forfeiture concerning the following property: the real property located at 4330 Cielo Trail, Midlothian, Texas, more particularly described as Lot 3, Block F, Stonewood Ranch, Phase Two, An addition to Ellis County, Texas, According to the Plat thereof Recorded in Cabinet G, Slides 337-338, Plat Records, Ellis County, Texas, including all buildings, appurtenances, and improvements located thereon.

## LEGAL AUTHORITY FOR FORFEITURE

4.      Based on my training and experience, I know that, pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1347 is subject to civil forfeiture.

## ADMITTED FACTS SUPPORTING FORFEITURE

5.      In connection with her guilty plea, Norman signed a factual resume dated July 16, 2015, in which she admitted the truth of each fact set forth in paragraphs 6 through 20, below.

6.      The Texas Medicaid Program ("Medicaid") was a state program jointly funded by the State of Texas and the federal government that provided medical and related services to families with dependent children, and aged, blind, or disabled

individuals whose income and other financial and economic resources were insufficient

for them to meet the cost of necessary medical services. Individuals receiving benefits

through Medicaid were referred to as Medicaid "clients."

7.     Medicaid was a "health care benefit program" as defined by 18 U.S.C.

§ 24(b), that affected commerce, and as that term is used in 18 U.S.C. § 1347.

8.     Medicaid paid for certain out-patient psychotherapy services provided by

licensed counselors in individual, family, and group settings.

9.     Alexis C. Norman was the CEO and Executive Director of Greater

Southwest Group, Inc. (GSWG) and Ellis County Community Services (ECCS), both

located in the Northern District of Texas. Norman obtained Medicaid group numbers for

GSWG and ECCS and used those numbers, together with individual Medicaid provider

numbers, to submit claims to Medicaid.

10.     Norman is not licensed as a psychotherapist or other mental health provider.

11.     From in or around December 2, 2009, through in or around June 30, 2014,

in the Dallas Division of the Northern District of Texas, and elsewhere, Norman, and

others did knowingly and willfully execute, and attempt to execute, a scheme and artifice

to defraud and to obtain, by means of materially false and fraudulent pretenses,

representations, and promises, money and property owned by, and under the custody and

control of Medicaid, a health care benefit program affecting commerce, as defined by 18

U.S.C. § 24(b), in connection with the delivery of, and payment for, health care benefits, items, and services—namely individual and family psychotherapy.

12.    As part of the scheme and artifice to defraud, Norman sought to obtain and did obtain payment from Medicaid by submitting claims for individual and family psychotherapy sessions that were not performed.

13.    As part of the scheme and artifice to defraud, Norman used the means of identification of more than 500 Medicaid clients—mostly minor children—to submit claims for services that were not performed.

14.    As part of the scheme and artifice to defraud, Norman used the Medicaid provider numbers of licensed counselors, without their knowledge and consent, to submit claims under the GSWG and ECCS group numbers for services that were not performed.

15.    As part of the scheme and artifice to defraud, Norman used the means of identification of a licensed counselor, without his knowledge and consent, to obtain a Medicaid provider number on his behalf, which Norman then used to submit claims for services that were not performed.

16.    As part of the scheme and artifice to defraud, Norman used the Medicaid provider information of licensed counselors who applied for positions as contract counselors at GSWG and ECCS, but who were never hired and never worked for Norman, GSWG, or ECCS.

17.     As part of the scheme and artifice to defraud, Norman used the Medicaid provider information of licensed counselors who worked for Norman, to submit claims for psychotherapy services that pre- and post-dated the counselors' actual employment with Norman.

18.     From December 2, 2009 through July 17, 2014, Norman submitted direct claims to Medicaid through GSWG and ECCS totaling approximately $4,357,356.88 and was paid approximately $2,125,665.39 for these claims. During the same time period, Norman also submitted claims totaling approximately $1,145,368.00 to Medicaid Managed Care Organizations (MCOs) and was paid approximately $470,380.58 for these claims. Norman retained the right to present evidence of legitimate claims at sentencing.

19.     The purpose of the scheme and artifice to defraud was for Norman to unlawfully enrich herself by submitting, causing the submission of, and receiving payment for, fraudulent claims for reimbursement to Medicaid, which falsely represented that a licensed counselor provided individual or family psychotherapy services when in fact no such services were provided.

20.     In furtherance of and in execution of the scheme and artifice to defraud, Norman, acting willfully and with the intent to defraud, and aided and abetted by others known and unknown, in the Dallas Division of the Northern District of Texas and elsewhere, on or about January 11, 2013, knowingly and willfully submitted, and caused to be submitted, false and fraudulent claims to Medicaid, that falsely represented that

Verification Affidavit – Page 5

psychotherapy family counseling services were provided by M.G. to Medicaid beneficiary J.M. in the amount of $240.00. All in violation of 18 U.S.C. §§ 1347 and 2.

21.     On July 8, 2015, Norman, her attorney Michael Snipes, Sergeant Joyce Combest of the Office of the Texas Attorney General Medicaid Fraud Control Unit, Assistant United States Attorney Douglas Brasher, and I met pursuant to a proffer agreement signed and agreed to by Norman, her attorney, and AUSA Brasher on behalf of the United States Attorney's Office for the Northern District of Texas. The terms of the proffer agreement specifically permit the United States Attorney's Office to "use the information provided during the proffer meeting … in any civil case, including forfeiture."

22.     During the July 8, 2015, proffer meeting, AUSA Brasher explained to Norman what was required for a claim to be legitimate and Norman responded that there were no claims where all the requirements were followed.

23.     This admission by Norman corroborates facts learned during the investigation. For example, the parent and/or guardian of 28 Medicaid clients and two Medicaid clients over the age of 18 were interviewed regarding counseling services that were allegedly provided by ECCS or GSWG. All interviewed parties stated that they or their dependent(s) did not receive any counseling services from either company. Each party also advised that no one ever came to their home to provide any services. And each interviewed party advised they had never heard of either company.

24.     Counselors who did work for Norman confirmed their dates of employment, which revealed that Norman submitted claims that pre-dated and post-dated their actual employment with her.  Moreover, the counselors reviewed lists of clients for whom they were listed as the performing provider and were unable to recognize a single name from the lists.

25.     For example, M.G., a Licensed Professional Counselor was interviewed on April 9, 2014.  M.G. worked part-time at ECCS from July 6, 2010, through December 26, 2011.  The Medicaid claim data, however, showed that Norman submitted claims listing M.G. as the performing provider from March 6, 2010 through May 15, 2014. Additionally, M.G. did not recognize a single name from a list Sergeant Combest showed him, which contained the names of 82 patients for whom he was listed as the performing provider at ECCS in Medicaid claims data.  M.G. advised that he had never worked at, nor heard of, GSWG, and was unable to recognize a single name from a list of 95 patients for whom he was listed in the Medicaid claims data as the performing provider at GSWG.

## FINANCIAL ACTIVITY LINKED TO CRIMINAL VIOLATIONS

26.     I have reviewed Ellis County deed records, Ellis County Appraisal District reports, JP Morgan Chase financial records, Bank of America financial records, Vintage Bank loan records, and other documents to conduct the following analysis.

27.     On March 22, 2010, Norman opened JP Morgan Chase, N.A. account number xxxx7081, titled to Greater Southwest Group Corporation.  Norman had sole

signature authority on the account.  Starting in August 2010, Medicaid Administrator

TMHP made automated direct deposits into account number xxxx7081.  The automated

deposits TMHP made into the account from August 2010 through July 2013 totaled

$1,098,355.38.  Before this time, checks from TMHP were deposited into the account.

28.    On July 8, 2010, Norman opened Bank of America account number

xxxx2249, titled to Ellis County Services, Inc.  Norman also had sole signature authority

on this account.  In March of 2011, TMHP made automated direct deposits into this

account.  The automated deposits TMHP made into the account from March 2011 through

May 2013 totaled $682,627.04.

29.    On July 28, 2010, a Warranty Deed with Vendor's Lien was filed in the

Ellis County property records transferring title to 4330 Cielo Trail, Midlothian, Texas

76065 (property) to Norman.  Vintage Bank had a lien against the property in the original

amount of $350,000.00.

30.    A review of Vintage Bank records established that Vintage Bank sold the

property to Norman for a sales price of $400,000.00, with a $50,000.00 due at closing in

cash and the remainder to be paid through a loan Vintage Bank extended to Norman.  The

Vintage Bank records included a copy of the Settlement Statement for Norman's purchase

of the property dated July 26, 2010, showing that Norman paid cash at closing in the

amount of $59,665.67, which included the $50,000.00 down payment plus related closing

costs. Bank records from JP Morgan Chase account number xxxx7081 showed a withdrawal on July 27, 2010, in the amount of $59,665.67.

31. A review of the financial records for JP Morgan Chase account numberxxxx7081 for July 2010 established that on July 2, 2010, the account had a balance of $20,608.29. There were four deposits totaling $71,720.60 made to the account between July 2, 2010, and July 27, 2010—the day the funds were withdrawn to pay for the property. These four deposits were Medicaid checks from TMHP to GSWG. Between July 2, 2010, and July 27, 2010, Norman made various withdrawals totaling $32,200.77 from account number xxxx7081. Based on a first-in-first-out assumption, all of the initial balance of $20,608.29 was spent prior to the withdrawal of the $59,665.67 for the property purchase. Since all deposits between July 2, 2010, and July 27, 2010, were from TMHP Medicaid checks, Norman's purchase of the property was funded completely from the Medicaid checks.

32. A review of Vintage Bank records also established that Norman made monthly payments to Vintage Bank for the loan for the purchase of the property beginning in August 2010, and as of July 7, 2014, Norman's loan payments totaled $111,751.79. A further review of the bank records established that at least $46,218.28 of this amount was paid from JP Morgan Chase account number xxxx7081 and at least $22,150.77 was paid from Bank of America account number xxxx2249, to Vintage Bank.

Verification Affidavit – Page 9

## CONCLUSION

33.    Based on my training, experience, and the information set out in the

preceding paragraphs, I believe the property described in paragraph 3 constitutes or is

derived from proceeds traceable to a violation of 18 U.S.C. § 1347.

*Patricia Ortiz*

PATRICIA ORTIZ
Special Agent, Federal Bureau of Investigation


Subscribed to and sworn before me on this 1st day of September 2015.

*Colleen M Plowman*

Notary Public

COLLEEN MARIE PLOWMAN
My Commission Expires
August 30, 2018

COLLEEN MARIE PLOWMAN
My Commission Expires
August 30, 2018

**Verification Affidavit – Page 10**